[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On or about June 15, 1998, the plaintiff entered into an agreement with the defendant Asphalt Alternatives, L.L.C. (hereinafter referred to as A A) to provide flagging services of two flaggers per work day to job sites in the state of Rhode Island where the defendant A A was performing services under two separate contracts between the defendant A 
A and the Rhode Island Department of Transportation known as "Crack Sealing Program C-2 Central Region, No. 9848 covered by a Contract Bond for Full Performance and Full Payment wherein the defendant Gulf Insurance Company (hereinafter Gulf), an insurance company authorized to transact insurance business in the state of Rhode Island, was the surety, Bond number AE5926085" in the counties of Providence and Kent, Rhode Island (defendant's exhibit B) and "Crack Sealing Program C-3 Southern Region, No. 9850 covered by a Contract Bond for Full Performance and Full Payment wherein the defendant, Gulf, an insurance company authorized to transact insurance business in the state of Rhode Island, was the surety, Bond Number AE5926086" in the county of Washington, Rhode Island (defendant's exhibit C).
Both bonds were issued pursuant to the laws of the state of Rhode Island. The plaintiff has only made a claim against the defendant Gulf on Bond Number AE5926085 (plaintiff's exhibit 7).
On the following occasions, at least one of the individuals sent by Interstate Flagging, Inc., to perform flagging services for the defendant A A arrived late to the job in Rhode Island, forcing the defendant's crew to delay starting work or forcing the defendant's crew to shut down and restart their equipment:
 June 19, 1998, one flagger was two hours late; CT Page 13332 July 14, 1998, one flagger was 30 minutes late; July 15, 1998, one flagger was one hour late; August 7, 1998, one flagger was four hours late; and, August 19, 1998, one flagger was thirty minutes late.
The plaintiff claims that it performed services under that contract and is owed $21,788.78. It has initiated this suit now in four counts, the first three of which are against the defendant A A and the Sixth Count is against defendant Gulf on Bond Number 5926085. In its claims against A A, the First Count is based on breach of contract, the Second Count for wrongfully withholding payments on the contract and the Fifth Count for wrongfully disputing the plaintiff's claim thus causing Gulf to refuse to pay on the bond. The Third and Fourth Counts were withdrawn. The principals in each company testified and predictably they agreed on practically nothing. However, in their Joint Trial Management Conference Report dated July 30, 2001, in Section VII both sides stipulated as true the facts set forth in Section II of this report. The court will, therefore, find those facts proven.
The contract in question was preceded by a phone call from Peter Murphy on behalf of A A to David Bailey, the plaintiff's president, on June 15, 1998. Murphy was looking for flaggers to perform traffic control on two jobs his Connecticut company was doing in Rhode Island. Bailey was hesitant because the job was out of state. He indicated he wanted references from A A and he insisted the job be bonded, which Murphy assured him it was. Murphy then faxed him what is plaintiff's Exhibit 1, which became the contract. it obviously is not in contract form and has created more problems than it has solved but it is all there is. Time was of the essence and Murphy stated he needed the flaggers by June 18, 1998. Plaintiff's exhibit 2 was a fax from the plaintiff to A A confirming the terms of the agreement at least as to hourly rates and the term of payment "Net 30 Days." The plaintiff began providing flaggers on June 19, 1998.
The agreement itself (plaintiff's exhibit 1 and defendant's exhibit D) provide certain terms. Defendant's exhibit D is the original fax of the contract from A A. Plaintiff's exhibit 1 has other handwriting of David Bailey on behalf of the plaintiff as to clarification of defendant's D that he discussed with Murphy and which he claims Murphy agreed to. The court finds these terms became part of the contract. The original fax described two Department of Transportation projects, numbers 9850 and 9840. The 9840 project number was in error as it was actually 9848. Bailey, in handwritten notes in the margin, indicates the hourly rates of his flaggers, indicated that he would bill A A weekly and the term of payment was 30 days net. He said Murphy agreed to this. CT Page 13333
Another term of the agreement called for certified payrolls prior to payment. At the time of the contract, neither Bailey or Murphy knew what that specifically meant, but they seemed to agree that if the plaintiff's accountant certified the payrolls and attached the time sheets that would suffice. This becomes important because of subsequent developments. Certainly, there were no forms available at that time from A A or the State of Rhode Island that were provided to the plaintiff.
The contract also stated "copy of our performance and full payment bonds guaranteeing payment." Mr. Bailey in reviewing the contract read the word "bonds" as "bond", the singular. The court believes it is clearly the plural "bonds." This also becomes important. The bonding was essential to the plaintiff. It asked for a copy of the bond and claims it received one bond from A A on June 15, 1998, by fax (plaintiff's exhibit 11), a copy of bond no. 5926085 for contract number 9848, the Central Region project and no other. Mr. Murphy claims he faxed both that bond and bond no. 5926086, the bond for project number 9850, the Southern Region job. In support of its position, the defendant points out on plaintiff's exhibit 11 regarding the fax copy of Bond No. 5926085 that it only encompasses pages three and four of the fax and obviously the first two pages would have been Bond No. 5926086. The court concludes that the contract references two projects, two bonds and that the plaintiff received a copy of both bonds. This is central because plaintiff's claim against Gulf is only as to Bond No. 5926085 which guaranteed the Central Region project.
The court is going to deal with the Sixth Count as to Gulf Insurance first. There is a motion to dismiss that count on jurisdictional grounds and other technical defenses to it. The court will not deal with those but will dispose of the case on the merits. As has been stated, the suit on against Gulf Insurance is only on Bond No. 5926085. That Bond was for the 9848 project, the Central Region project. As of August 20, 1998, all work performed by A A had been done in the Southern Region project no. 9850. All the plaintiff's invoices referenced the 9850 project. The plaintiff claims it did not know to what project it sent the flaggers and that may not effect its rights against A A, but it is significant as to its rights against Gulf.
Gulf supplied the A A with two bonds, one for each of the projects. The plaintiff apparently supplied its services almost exclusively to the Southern project, no. 9850, which had a different bond than the one sued upon. The bond on which it sued was the Central Region project, no. 9848, which it neither invoiced or performed services for. There is then a failure of proof as to the Sixth Count, and judgment may enter for the defendant Gulf Insurance on that count. That also disposes of Count Five against A A and judgment shall enter for the defendant A A on that CT Page 13334 count.
The balance of the case involves the plaintiff's claim against A A for its services under the contract and the counterclaim seeking damages resulting from the tardy appearance of the plaintiff's flaggers. These are purely factual issues requiring little or no case analysis.
The plaintiff had a contract to supply flagging services to the defendant on two contracts the defendant had with the State of Rhode Island to seal cracks in pavement in two separate areas of the State of Rhode Island. The plaintiff made it clear to the defendant that it had to pay its flaggers and therefore would be billing the defendant weekly with payment on a 30 day net basis. There was no opposition from the defendant to that term. This was not a "pay as paid" contract where the defendant had no obligation to pay the plaintiff until it was paid by the state. Maybe it should have but it did not.
There was always an awareness that a certified payroll was necessary for the defendant to get paid by the State, but that was never a condition to the plaintiff getting paid. The defendant provided no accepted form for the plaintiff to use to conform to this requirement at the time of contract although it was testified to that the defendant in fact used the proper form for its own work. The defendant merely told the plaintiff that it would submit what the plaintiff submitted to the State. Apparently, those submissions were not acceptable to the State and it did not pay the defendant on them.
A major difference of opinion prevails about what was done about this. The plaintiff's president testified he was never told by the defendant that the certified payrolls were a problem until late August, and it was not supplied with the proper forms until some time in October. They were then filled out and submitted, but no payment was ever forthcoming from the defendant.
Peter Murphy's wife, Mary, the defendant's manager, testified that in August, when she became aware that a specific form of payroll certification was necessary after a conversation with the State, she faxed and mailed it to the plaintiff. The plaintiff vehemently denies that this was done until after it left the job on September 17, 1998. It appears obvious to the court that the plaintiff, who was demanding payment, would have filled out those forms immediately in August if in fact it had received them. That is what it did when it got them in October. The court finds it more credible that the forms were not provided until after the plaintiff left the job.
The plaintiff submitted thirteen invoices to the defendant from June CT Page 13335 26, 1998 through September 24, 1998, totaling $27,955.89. That first invoice, due on July 26, 1998, in the amount of $2,667.02 was paid on August 14, 1998. Nothing else was paid until September 17. There were repeated contacts by the plaintiff in an effort to get paid. The plaintiff clearly threatened that if it was not paid by September 17, 1998, for at least three or four of the overdue invoices it would leave the job. Mr. Murphy testified that the parties agreed that if $3,500 were paid by that day the plaintiff would not leave the job. The plaintiff denies ever agreeing to the $3,500 figure. When all it got on September 17, 1998, was $3,500, it notified the defendant and stopped supplying services to the defendant on September 18, 1998.
The court finds that the defendant did breach its agreement to pay for the plaintiff's flagging services and there is an amount due and owing in the amount of $21,788.87. Judgment will enter on the first count for the plaintiff in that amount. The court, therefore, need take no action on the second count.
As to the counterclaim, there does not appear to be any dispute as to the basis of it although there may be as to damages. It is admitted that on five occasions the flaggers scheduled for the job did not arrive on time. On June 19, 1998, one of the two flaggers was two hours late. On July 14, 1998, one of the two flaggers was thirty minutes late. On July 15, 1998, one of the two flaggers arrived one hour late. On August 7, 1998, one of the two flaggers arrived four hours late and on August 19, 1998, one of the two flaggers arrived thirty minutes late. The reasons that they were late and the efforts made to replace them are irrelevant.
The plaintiff claims that it did not guarantee that its flaggers would be on time 100% of the time or agree that it would be liable for consequential damages if they were. There is no merit to either of those arguments. The fact that they were late on those days, which is admitted, is a breach of the plaintiff's obligation under the contract, and if in fact consequential damages flowed from it, the plaintiff is liable.
Peter Murphy described what happened each morning on the job. His personnel would arrive early, prepare and heat the sealant and put up the road signs. A state inspector was always present. If only one of the flaggers was there, the inspector would not allow the job to start and the sealant furnace would be shut down and the signs removed. All of his personnel and equipment, mostly leased, would be idled, but of course he had to pay for them. When the tardy flagger arrived, they had to reheat the material, put the signs back up and, if the inspector was still there, he would authorize the start of the job. CT Page 13336
The defendant presented his damages as to each of the five days on defendant's exhibit H. Those damage claims were not refuted and will not be repeated as to detail, but the court finds the damages for people, equipment and materials for June 19 were $1,570.53, for July 14 $1,591.45, for July 15, $1,543.85, for August 7 $3,087.70 and for August 19 $1,452.95 for a total of $9,246.65.
The court will not allow damages for September 18, 1998, the first day the plaintiff failed to supply flaggers because the court finds that the defendant was aware that the plaintiff was terminating its services to the defendant for its failure to pay for services, which the court has already found. For the same reasons, the court will not allow the liquidated damages the State assessed against the defendant for September 21, 22, 23 and 24.
The court will allow as damages the pro rata assessment of liquidated damages imposed upon the defendant by the State for the late starts on June 19, July 14 and 15 and August 7 and 19 in the total amount of $1,237.50 as set forth on pages 7 and 8 of the defendant's brief.
The court finds unproven any other claim for damages based on the plaintiff's late arrivals or from its leaving the job on September 18, 1998. Judgment will therefore enter for the defendant on the counterclaim in the amount of $10,484.15.
The court has considered each party's request for statutory interest and concludes in its discretion that no interest should be assessed against either party.
GORMLEY, J.